## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

—————————————————————————— )
GARY BEAN,                                    )
                                              )
            Plaintiff,                        )
                                              )          Civil Action No.
      v.                                      )          23-12394-BEM
                                              )
NICE SYSTEMS, INC., NICE SYSTEMS              )
TECHNOLOGIES, INC., and                       )
INCONTACT, INC.,                              )
                                              )
            Defendants.                       )
—————————————————————————— )

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTION TO STRIKE AND MOTION FOR SUMMARY JUDGMENT

**MURPHY, J.**

      This is an action for unpaid commissions. Plaintiff Gary Bean alleges that Defendants NICE Systems, Inc. ("NICE Systems"), NICE Systems Technologies, Inc. ("NICE Systems Tech."), and inContact, Inc. ("inContact") (collectively, "Defendants") violated the Massachusetts Wage Act (the "Wage Act") and breached the implied covenant of good faith and fair dealing by failing to pay commissions he earned and for terminating his employment for complaining about his compensation. Before the Court now is Defendants' motion for summary judgment and Defendants' motion to strike certain portions of Mr. Bean's affidavit and statement of facts. For the reasons set forth below, Defendants' motion to strike is GRANTED in part and Defendants' motion for summary judgment is GRANTED.

## I.    Background

### A.    Factual Background[1]

inContact is a subsidiary of NICE Systems.  Dkt. 32 ("Defs.' SOF") ¶ 1.  NICE Systems

Tech. is an indirect subsidiary of NICE Systems.  *Id.*  NICE Systems is a subsidiary of NICE Ltd.

*Id.*  inContact provides cloud-based services to customers through a Software as a Service ("SaaS")

called CXone.  *Id.*

Beginning in September 2021, Mr. Bean worked for inContact as a Senior District Sales

Manager with the company's Marquee Sales Team (the "Marquee Team").  *Id.* ¶ 3.  The Marquee

Team supports new sales to existing customers.  Dkt. 37 ("Pl.'s SOF") ¶ 2.  In other words, the

Marque Team sells CXone to existing customers who had contracts for other inContact solutions

but had not yet purchased CXone.  Defs.' SOF ¶ 10.  Members of the Marquee Team were eligible

to earn commissions, though Defendants were entitled to assign members of the Marque Team,

including Mr. Bean, work that was not commission eligible.  *Id.* ¶¶ 4–5, 38.

In addition to a base salary, part of Mr. Bean's compensation included a commission plan.

*Id.* ¶ 6.  His commission compensation was governed by the terms of an applicable sales incentive

plan, the terms of which Mr. Bean accepted.  *Id.* ¶ 13.  Mr. Bean's sales incentive plan for 2022

(the "2022 Commission Plan") defined and distinguished between sales classified as "New

Business" and those classified as "Renewals."  *Id.* ¶¶ 52–54.  "New Business" was defined as "the

---

[1] While Defendants take issue with Mr. Bean's failure to file a paragraph-by-paragraph response to their statement of facts and instead providing his own counterstatement of the facts, "Massachusetts Local Rule 56.1 does not require paragraph-by-paragraph rebuttal."  *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 832 F.3d 1, 4, n.2 (1st Cir. 2016) (citing *McGrath v. Tavares*, 757 F.3d 20, 26 n.10 (1st Cir. 2014)).  The Court accepts as true those facts which Mr. Bean fails to contest, but considers any evidence Mr. Bean has cited—subject to the Court's decision on the motion to strike discussed below—as creating a dispute and draws all reasonable inferences in Mr. Bean's favor.  *Id.* (citing *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 12 (1st Cir. 2003)).

initial Booking of a particular Product, Subscription Deal or Order for Maintenance." Dkt. 34-3 at 3.10.1. "New Customer" was defined as:

> a Customer at a Top Parent Account level [ ] that has not purchased any line of Business from a Top Division or been active with any Line of Business from a Top Division within twelve (12) months prior to the applicable Booking.

*Id.* at 3.28. The 2022 Commission Plan further clarifies that "Renewals are not considered New Customers." *Id.* "Renewal" was defined as "a Booking for any years of Subscription Deal or an Order for Maintenance beyond the term of the initial Booking." *Id.* at 3.10.2. Mr. Bean's commission plan provided eligibility only on bookings classified as "New Business," and Mr. Bean conceded during his deposition that he was never eligible for commissions on bookings classified as "Renewals." Defs.' SOF ¶¶ 16, 55, 59. The 2022 Commission Plan further noted that "[t]his plan supersedes all prior plans, agreements or understandings, oral or written . . . . Any plan agreement or understanding, oral or written, which purports to supplement, amend or modify this Plan must be proposed either in writing or in a ticket issued in NICE [Ltd.]'s 'SNOW' system and approved, if at all, in writing or in the SNOW system by the VP of Global Business Operations or by the CEO of NICE [Ltd]." Dkt. 34-3 at 10.2.

In or around July 2022, Mr. Bean was asked to assist with an existing CXone customer, Versant Health ("Versant"), that had recently issued a request for proposal ("RFP") seeking more favorable contract terms in its next contract for CXone solutions. Defs.' SOF ¶¶ 48–49. The parties dispute whether Mr. Bean was informed by his management that the deal was deemed not to be a "Renewal," due to Versant's decision to solicit RFPs from competitors and not seek a renewal from inContact. Pl.'s SOF ¶ 7. Around September 2022, inContact informed Mr. Bean that the Versant deal was a "Renewal." Defs.' SOF ¶ 60. Mr. Bean contends that he repeatedly raised concerns that went unanswered through September, October, and November 2022 regarding

whether he would receive any compensation for the Verdant deal. Pl.'s SOF ¶ 10. Mr. Bean continued to work on the Verdant deal, which ultimately was signed around October 2022. Defs.' SOF ¶ 66. Mr. Bean raised several complaints with his supervisor, Kyler Wilson—inContact's Regional Vice President of Marquee Sales, Defs.' SOF ¶ 8—about the fact that he was not eligible for quota credit or commission on the Versant deal. *Id.* ¶ 69; Pl.'s SOF ¶ 10.

Separately, on or around November 29, 2022, Mr. Wilson asked Mr. Bean to prepare a presentation and deliver it on December 2, 2022, for Mr. Wilson and Ryan Mulholland—inContact's Senior Vice President of Marquee Sales from mid-2022 through Mr. Bean's termination. Defs.' SOF ¶¶ 9, 72–73. As part of his training, Mr. Bean rehearsed this presentation with Mr. Wilson on multiple occasions leading up to December 2, 2022. *Id.* ¶ 74. During the December 2, 2022 meeting, Mr. Bean raised complaints about his lack of commissions from the Versant deal and other issues with the 2022 Commission Plan, rather than completing his planned presentation. *Id.* ¶¶ 76–77, 80; Pl.'s SOF at 7–8. Mr. Mulholland requested that Mr. Bean complete the planned presentation instead and set up a meeting later to discuss commission concerns. Defs.' SOF ¶¶ 79, 82, 84–85. Mr. Bean refused to conduct the planned presentation until Mr. Mulholland reviewed all of the concerns outlined in Mr. Bean's compensation-related presentation during the December 2, 2022 meeting. *Id.* ¶ 87. Mr. Mulholland warned Mr. Bean during the December 2, 2022 meeting that his employment may be terminated if he refused to do the planned presentation at that time. *Id.* ¶ 88.

After Mr. Bean failed to deliver the planned presentation, Mr. Mulholland made the decision to terminate Mr. Bean's employment, pointing to Mr. Bean's insubordination during the meeting and unwillingness to present the pitch as scheduled. *Id.* ¶¶ 90–91. The parties do not

dispute that Mr. Bean would not have been fired if he had completed the presentation as planned. *Id.* ¶¶ 90–92.

### B.        Procedural Background

Mr. Bean filed this action on July 20, 2023, in Massachusetts Superior Court.  Defendants removed the case to this Court on October 16, 2024.  Dkt. 1.  Defendants have now moved for summary judgment. Dkt. 31.  On April 4, 2025, Defendants moved to strike portions of Mr. Bean's affidavit filed in support of his opposition to Defendants' summary judgment motion.  Dkt. 41. The Court heard oral arguments on both motions on April 29, 2025, and took the matter under advisement.

## II.    Standard of Review

Summary judgment will only be granted where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Grogan v. All My Sons Bus. Dev. LLC*, 552 F. Supp. 3d 142, 145 (D. Mass. 2021) (quoting Fed. R. Civ. P. 56(a)).  Affidavits may be offered in opposition to summary judgment if they set forth facts that would be admissible under the Federal Rules of Evidence.  Fed. R. Civ. P. 56(e). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  The Court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).

"At summary judgment, the court's task is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* (citations and internal quotes omitted).  "[W]hen the facts support plausible but conflicting inferences on a

pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir. 1995). As such, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem most plausible, or because the opponent is unlikely to prevail at trial," regardless of any skepticism the Court may hold as to the merits of a case. *Hazard v. S. Union Co.*, 275 F. Supp. 2d 214, 222 (D.R.I. 2003); *see also United States v. New England Merchants Nat. Bank*, 465 F. Supp. 83, 86 (D. Mass. 1979) ("The plaintiffs have a right to a trial '. . . where there is the slightest doubt as to the facts.'" (alteration in original) (quoting *Peckham v. Ronrico Co.*, 171 F.2d 653, 657 (1st Cir. 1948); *Landy v. Silverman*, 189 F.2d 80, 82 (1st Cir. 1951))).

### III.    <u>Motion to Strike</u>

While parties are permitted to use affidavits in opposition to summary judgment, such an affidavit:

> Shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

Fed. R. Civ. P. 56(e). "The rule requires a scalpel, not a butcher knife." *Perez v. Volvo Car Corp.*, 247 F.3d 303, 315 (1st Cir. 2001). As such, only the portions of an affidavit that violate this rule should be disregarded or stricken. *See, e.g.*, *Blais v. Hartford Fire Ins. Co.*, 2011 WL 1303135, at *4–7 (D. Mass. Mar. 30, 2011) (striking only specific portions of affidavit that were not admissible).

Defendants move to strike portions of Mr. Bean's affidavit, specifically paragraphs 9 through 11, and the corresponding paragraphs of Mr. Bean's statement of facts that rely solely on the affidavit at issue. *See generally* Dkt. 42. Defendants make two primary arguments: (1) that certain statements are contradicted by prior testimony; and (2) that certain statements are entirely speculative and irrelevant.

A.    <u>**Statements Allegedly Contradicted by Prior Testimony and the Record**</u>

Defendants argue that two paragraphs of Mr. Bean's affidavit must be stricken because they are contradicted by his prior deposition testimony:

> 9.  Throughout September, October and November, I repeatedly raised concerns to Kyler about how/if I would receive any credit or compensation for the Versant deal. His repeated response was that he would discuss it with his supervisor Ryan Mulholland.  On multiple occasions, I asked Kyler for meetings with Mulholland to discuss this issue.  He would not provide a firm answer and would say things to the effect of he'd check to see if that was a possibility.
>
> 10.  The failure by the Defendants to provide me with an answer as to the Versant compensation and other issues around my commissions is what led to my insisting on discussing it on December 2, 2022, and getting terminated as a consequence.

Dkt. 39-3 ¶¶ 9–10.

"When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory." *Blais*, 2011 WL 1303135, at *6 (quoting *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4–5 (1st Cir. 1994)).  Where an affidavit clearly contradicts prior testimony, the affidavit must provide "a satisfactory explanation of why the testimony is changed."  *Colantuoni*, 44 F.3d at 5. Additionally, affidavit statements "blatantly contradicted by the record" do not create a genuinely disputed material fact.  *Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 140 (1st Cir. 2013) (disregarding plaintiff's deposition testimony that she did not work certain hours when earnings statements and her statement of material facts said otherwise).

The part of paragraph 10 that references "the Versant compensation" clearly contradicts Mr. Bean's prior deposition responses.    Mr. Bean repeatedly acknowledged that by September 2022 and repeatedly afterwards, Mr. Wilson had communicated to him, and Mr. Bean had acknowledged and understood, that under the 2022 Commission Plan, the Versant deal was a "Renewal" and, thus, neither quota- nor commission-eligible.  Dkt. 35-1 ("Bean Dep.") at

218:21–219:14, 221:24–224:5; 259:8–21.  Further, even if these statements were not considered contradictory, but merely clarification as Mr. Bean argues, Dkt. 45 at 2–3, the record and Mr. Bean's own statement of facts make clear that he was told by Defendants as of September 2022 that the Versant deal was a "Renewal" that would not qualify for commissions.  *See, e.g.*, Pl.'s SOF ¶ 9; Dkt. 35-6–8.  As such, because Mr. Bean's affidavit provides no explanation for this conflict, the portion of paragraph 10 that deals with the Versant deal—"the Versant compensation"—must be stricken.

That said, paragraph 9 and the remainder of paragraph 10 do not clearly contradict Mr. Bean's prior testimony.  The deposition did not appear to discuss to what extent Mr. Bean raised his concerns about commissions "[t]hroughout September, October and November," nor do Defendants contest that Mr. Bean made complaints about his commissions throughout 2022.  *See generally* Dkt. 42.  Defendants do not identify any prior testimony from Mr. Bean that contradicts the portion of his affidavit regarding his attempts to meet with Mr. Mulholland to discuss complaints.  *Id.*  The Court does not read the affidavit as stating that Mr. Bean received no answer to his complaints about commissions, but instead that he received no firm answer to his requests to meet with Mr. Mulholland to raise his complaints.  Thus, Defendants' motion to strike with regards to paragraph 9 and the remainder of paragraph 10 is denied.

### B.    Allegedly Speculative and Irrelevant Statements

Defendants also argue that paragraph 11 of Mr. Bean's affidavit is both speculative and irrelevant.  Paragraph 11 provides:

> 11.  At execution, the Versant deal had a guaranteed minimum of $500,000.00 per year for three years. Over the course of that three-year deal, (1) if I received adequate credit, (2) not been terminated, and depending on my other sales, I estimate I would have received $80,000.00 in commission payment. At the time of execution of the Versant deal, had it not been retroactively designated a renewal, I would have received roughly **$54,075.00**. This number consists of:

- OTI Bonus 35% of my quota attainment multiplied by a 70% incentive multiplier multiplied by my OTI of $135,000.00. The formula is .35 x .7 x $135,000.00= **$33,075.00**.
- A new logo bonus of **$11,000.00**.
- A long-term commit bonus of **$4000.00**.
- A Telco bonus of **$6000.00**.

Dkt. 39-3 ¶ 11 (emphases in original).

"[U]nsupported, speculative assertions" and conclusory statements in an affidavit submitted in opposition to summary judgment do not create a genuine or a material fact sufficient to warrant proceeding to trial. *Garmon v. Natl. R.R. Passenger Corp.*, 844 F.3d 307, 315 (1st Cir. 2016). Statements that are argumentative or amount to "mere unsupported characterizations," personal opinions, or "subjective beliefs" do not create a triable issue. *Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 425 (1st Cir. 2017) (plaintiff "provides no detail and no support other than his subjective belief that he was being discriminated against by Costco"). Further, only relevant evidence is admissible. Fed. R. Evid. 402. "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

Here, while Defendants correctly note that the calculation at issue in paragraph 11 "depend[s] on [Mr. Bean's] other sales," Dkt. 42 at 7, the ultimate calculation is still based on Mr. Bean's personal knowledge of the commission formula and the work he had done. And the amount of commission Mr. Bean would have earned from the Versant deal is clearly relevant to the issues of damages for all of his claims. As such, Defendants' motion to strike with regards to paragraph 11 is denied.

## IV.    Summary Judgment Motion

### A.    Massachusetts Wage Act Claims[2]

#### 1.    Choice of Law

When a federal court sits in diversity, it must apply the choice of law principles of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Thus, this Court must look to Massachusetts choice-of-law rules. With respect to contracts, Massachusetts employs a "functional" approach that responds to the "interests of the parties, the States involved, and the interstate system as a whole." *Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 631 (1985). Under this approach, the Court must apply the substantive law of the state with the most significant relationship to the transaction in the litigation. *Hendricks & Associates, Inc. v. Daewoo Corp.*, 923 F.2d 209, 212 n.3 (1st Cir. 1991). The Court need not, however, address the most significant relationship test where there is a choice-of-law provision. *Bushkin*, 393 Mass. at 632. There is no dispute that the 2022 Commission Plan clearly states that "the Plan shall be governed by and construed in accordance with the laws of the State of New Jersey."

However, that choice-of-law provision is not dispositive with respect to Mr. Bean's Wage Act claims. *See Melia v. Zenhire, Inc.*, 462 Mass. 164, 173–75 (2012) (holding that contract's choice of New York law would not govern plaintiff's Wage Act claim because it made no reference to statutory causes of action). Under the most significant relationship test, the Court considers the following factors:

> 1) the place of contracting; 2) the place of negotiation of the contract; 3) the place of performance; 4) the location of the subject matter of the contract; and 5) the

---

[2] The complaint asserts as Count I Defendants' "failure to due pay upon termination." Dkt. 1-2 ¶¶ 32–34. Defendants sought summary judgment on this claim, but Mr. Bean failed to address it in his opposition and thus waives opposition. *See Montany v. Univ. of New England*, 858 F.3d 34, 41 (1st Cir. 2017) ("Defendants argue that [plaintiff's] failure to put forth any argument in her opposition to defendants' motion for summary judgment [on a particular claim] constitutes abandonment of any such claim. Having read plaintiff's opposition, we agree."). As such, Defendants are entitled to summary judgment on Count I.

> domicile, residence, nationality and place of incorporation of the parties; 6) the needs of the interstate and international system; 7) the relevant policies of the forum; 8) the interest of those states in the determination of the particular issue; 9) the protection of justified expectations; 10) the basic policies underlying the particular field of law; 11) certainty, predictability and uniformity of result; and 12) ease in the determination and application of the law to be applied.

*Dunfey v. Roger Williams Univ.*, 824 F.Supp. 18, 20 (D. Mass. 1993) (internal citations omitted).

Under these factors, Massachusetts has a more significant relationship to the case than New Jersey.  Mr. Bean lived and worked in Massachusetts, Dkt. 1-2 ¶¶ 1–2, and most importantly, the Commonwealth has a "fundamental policy interest in enforcing the Massachusetts Wage Act." *Levesque v. Schroder Inv. Mgmt. N. Am., Inc.*, 368 F. Supp. 3d 302, 312 (D. Mass. 2019) (citing *Melia*, 462 Mass. at 169).  Thus, with respect to the Wage Act claim, the Court finds that Massachusetts has the most significant contacts to the case and thus Massachusetts law applies.[3]

## 2.    <u>Failure to Pay Wages</u>[4]

In general, the Wage Act requires employers to pay employees earned wages within a specified amount of time.  Mass. Gen. Laws ch. 149, § 148.  The purpose of section 148 is to "protect employees and their right to wages."  *Electronic Data Sys. Corp. v. Att'y Gen.*, 454 Mass. 63, 70 (2009); *see also Reuter v. City of Methuen*, 489 Mass. 465, 471 (2022) ("[Massachusetts courts] have always recognized [the Wage Act] was intended for the protection of employees, who

---

[3] Neither party argues that the law of another state should apply.

[4] Defendants also argue that their setting of the 2022 sales quotas and the removal of forecasted sales from Mr. Bean's pipeline fail to establish a Wage Act violation.  Mem. at 9–11.  Defendants assert that they retained the discretion to amend the sales quotas, and that Mr. Bean both acknowledged this right and consented to the terms of the 2022 sales quota.  *Id.* at 9.  Further, Defendants argue that there is no prohibition against amending *future* commission terms, and that Mr. Bean cannot demonstrate any of the removed commissions ever became "due and payable" due to his admission that he did not close any of the forecasted sales allegedly removed from quota eligibility. *Id.* at 10–11.  Mr. Bean does not oppose these arguments, and thus waives the right to contest them.  *See Montany*, 858 F.3d at 41 ("Defendants argue that [plaintiff's] failure to put forth any argument in her opposition to defendants' motion for summary judgment [on a particular claim] constitutes abandonment of any such claim.  Having read plaintiff's opposition, we agree.") *see also Frady v. C. R. Bard, Inc.*, 2020 WL 2079511, at *3 (D. Mass. Apr. 30, 2020) (collecting cases).  As such, Mr. Bean has waived any claims that Defendants' setting of the 2022 sales quotas and removal of forecasted sales violated the Wage Act.

are often dependent for their daily support upon the prompt payment of their wages." (internal quotation marks and citation omitted)).  The terms of the Wage Act apply to commissions when the amount of the commission "has been definitely determined" and it "has become due and payable." *Parker v. EnerNOC, Inc.*, 484 Mass. 128, 133 (2020) (quoting Mass. Gen. Laws ch. 149, § 148); *Klauber v. Vmware, Inc.*, 80 F.4th 1, 10 (1st Cir. 2023).

Defendants argue that any commissions on the Versant deal were not due and payable because the Versant deal was a renewal, rather than a new customer or new business.  Dkt. 33 ("Mem.") at 11–12.

"Under Massachusetts law, employers and employees may agree to contingencies that must be satisfied before commission payments become due and payable such that they qualify as protected earnings for Wage Act purposes." *Klauber*, 80 F.4th at 12.  As such, commissions are "due and payable" only if any contingencies relating to their entitlement have occurred.  *Fine v. Guardian Life Ins. Co. of Am.*, 2022 WL 673663, at *8 (D. Mass. Mar. 7, 2022); *Lohnes v. Darwin Partners, Inc.*, 2002 WL 31187688, at *3 (Mass. Super. Ct. July 23, 2002).  "When a compensation plan specifically sets out the contingencies an employee must meet to earn a commission, courts apply the terms of the plan." *McAleer v. Prudential Ins. Co. of Am.*, 928 F. Supp. 2d 280, 289 (D. Mass. 2013) (citations omitted).

Here, the terms of Mr. Bean's 2022 Commission Plan provide that commissions are earned only if the following contingency is met: the sale must be classified as "New Business" rather than a "Renewal."  Mr. Bean does not dispute that he is entitled to commission on the Versant deal only if the deal qualifies as "New Business."  Instead, Mr. Bean argues that (1) the Versant deal qualifies as "New Business" under the terms of the 2022 Commission Plan; and (2) Defendants are not

permitted to deviate from their prior representation that the Versant deal would qualify as "New Business." Dkt. 38 ("Opp.") at 2–3.

*First*, Defendants correctly characterize the Versant deal as a "Renewal" under Mr. Bean's 2022 Commission Plan. There is no dispute that Versant had an active contract for CXone solutions with inContact tentatively set to expire in September 2022. Defs.' SOF ¶ 49; Pl.'s SOF ¶ 5. As such, any sale for CXone solutions to Versant in 2022 would be classified as a "Renewal" under the terms of the 2022 Commission Plan, not "New Business." *See* Dkt. 34-3 at 3.10.2. While Mr. Bean contends that he was originally told that the deal would be treated as New Business due to Versant's RFPs to competitors and decision not to renew with inContact, neither the definitions of "New Business" nor "New Customer" provide an exception for such deals that would otherwise be a Renewal.[5] *See* Dkt. 34-3 at 3.10.1, 3.28. Further, Mr. Bean conceded in his deposition that "the Company characterizing [Versant][sic] as a renewal was correct." Bean Dep. at 207:11–208:1; *see also id.* at 206:14–18 (agreeing that "to the extent [he was] first told that Versant was new business, that was incorrect with respective to the Sale[s] Incentive Plan"). Mr. Bean further confirmed at his deposition that he "understood at the time of closing [he was]

---

[5] Mr. Bean contends that *Okerman v. VA Software Corp.* requires that "that commission agreements explicitly defined by contract or company policy must be honored as promised." Opp. at 3 (citing *Okerman v. VA Software Corp.*, 69 Mass. App. Ct. 771, 772–73 (2007)). As an initial matter, the *Okerman* court affirmed the denial of a motion to dismiss on the basis that the Wage Act applied to commissions and that the plaintiff pleaded facts that, if proved true at trial, would satisfy the requirement that commissions be arithmetically determinable. *Okerman*, 69 Mass. App. Ct. at 789–80. In contrast, Defendants do not argue that the Wage Act does not apply to Mr. Bean's commissions, but instead argue that the Versant deal did not qualify under the 2022 Commission Plan for any commissions whatsoever. Mr. Bean further argues that *Israel v. Voya Institutional Plan Services, LLC* recognizes that employees are entitled "to commissions under documented incentive agreements when the required contractual conditions are met, regardless of employer claims of discretion." Opp. at 3 (citing *Israel v. Voya Institutional Plan Services, LLC*, 2017 WL 1026416, at *5 (D. Mass. Mar. 16, 2017)). While Mr. Bean is correct that commissions qualify as earned wages when the employee has completed his portion of the work necessary to qualify for the commission, even where the employer may not have finished its work required to calculate the commissions prior to the employee's resignation, Mr. Bean has not demonstrated that he satisfied the requirements to receive a commission for the Versant deal in the first place. As discussed above, by the terms of the 2022 Commission Plan, the Versant deal was correctly characterized as a renewal.

not going to receive any commission on the Versant [sale]," that only "[t]he renewal team" was eligible for commissions on the sale, and that "[n]o one on the Marquee Team" was eligible for commissions on the sale. *Id.* at 227:12–19.

*Second*, even if Mr. Bean had originally been told that the Versant deal would qualify as "New Business," no amendment or modification was proposed to or approved by either inContact's VP of Global Business Operations or its CEO, as required by the 2022 Commission Plan. Defs.' SOF ¶ 57. Without an amendment or modification implemented in accordance with the 2022 Commission Plan, any representations Mr. Bean contends he received fail to create a triable issue of fact given the fact that the Versant deal did not qualify as "New Business" under the 2022 Commission Plan. *See Vonachen v. Comput. Assocs. Int'l, Inc.*, 524 F. Supp. 2d 129, 136 (D. Mass. 2007) (holding plaintiff's sales manager's statements insufficient to create a triable issue of fact and did not change the company's contractual authority to adjust commissions); *Rivera v. Hosp. Metropolitano Dr. Susoni, Inc.*, 2012 WL 3777003, at *8–9 (D.P.R. Feb. 27, 2012) (holding statements by defendant's Director of Human Resources not effective to modify employee's contract because the contract stated that no variation on the terms shall be valid unless in writing), *report and recommendation adopted* 2012 WL 3776998 (D.P.R. Aug. 29, 2021).

As such, Mr. Bean cannot show that the Versant deal would qualify him for any commission payments to which he was entitled under the Wage Act. Thus, Defendants are entitled to summary judgment on Count II.

### 3. <u>Retaliation</u>

Employers are prohibited "from retaliating against employees who assert their rights: 'No employee shall be penalized by an employer in any way as a result of any action on the part of an employee to seek his or her rights under the wages and hours provisions of this chapter.'" *Parker*, 484 Mass. at 133 (quoting Mass. Gen. Laws ch. 149, § 148A); *see also Smith v. Winter Place LLC*,

447 Mass. 363, 366–68 (2006) (citing Mass. Gen. Laws ch. 149, § 148A) (holding that internal allegations qualify as "any action" under the statute). The Act further provides that "[a]ny employer who discharges or in any other manner discriminates against any employee because such employee has made a complaint . . . or has instituted . . . any proceeding . . . , or has testified or is about to testify in any such proceedings, shall have violated this section." Mass. Gen. Laws ch. 149, § 148A. "The plain language of . . . [section 148A] protects only actions taken by an employee 'to seek his or her rights.'" *Smith*, 447 Mass. at 368–69.

There are three elements to a *prima facie* retaliation claim: "(1) the plaintiff engaged in statutorily protected activity, and (2) his employer thereafter subjected him to an adverse employment action (3) as a reprisal for having engaged in the protected activity." *Blackie v. State of Me.*, 75 F.3d 716, 722–23 (1st Cir. 1996). Satisfying the third element requires "a causal connection . . . between the protected conduct and the adverse action." *Id.* at 723 (internal quotation marks and citations omitted). Where a defendant proffers a legitimate basis for termination, "the plaintiff bears the burden of showing that the employer's justification for the adverse action is pretextual and that there is a 'causal connection' between the employee's action and the employer's adverse action." *Serabian v. SAP Am., Inc.*, 2018 WL 1041540, at *5 (D. Mass. Feb. 23, 2018) (collecting cases).

Defendants do not dispute that Mr. Bean was subject to an adverse employment action when he was fired, but they contend that there is no genuine dispute of material fact as to whether Mr. Bean engaged in protected conduct and whether he was terminated because of that conduct. Defendants further argue that Mr. Bean cannot establish that the basis for his termination was pretextual.

*First*, Defendants contend that because Mr. Bean was not seeking wages owed to him or challenging other unlawful activity, but instead was raising complaints about how the quota and commissions were set, Mr. Bean cannot satisfy the first element of a *prima facie* retaliation claim. Mem. at 13–15. It is not enough to survive summary judgment that Mr. Bean complained about his compensation. To "maintain an actionable claim under § 148A, a plaintiff is not obliged to successfully prove h[is] right to seek recovery of the untimely paid 'wages' in question," but he must establish that he "reasonably believed the remuneration in question fell within the scope of the Wage Act." *Fraelick v. PerkettPR, Inc.*, 83 Mass. App. Ct. 698, 706 (2013) (citing *Abramian v. President & Fellows of Harvard Coll.*, 432 Mass. 107, 121 (2000)). But by Mr. Bean's own testimony, he did not believe that Defendants' actions were unlawful when he made his complaints. *See, e.g.*, Bean Dep. at 96:22–24 (testifying that his complaints prior to December 2022 did not involve wages that he believed were owed to him); *id.* at 97:1–5 (testifying that he did not believe it unlawful for Defendants to set his quota as high as they did); *id.* at 98:1–16 (same); *id.* at 141:6–13 (testifying that he had not earned any commissions on clients removed from his forecasted sales); *id.* at 164:2–13 (same, and that he was not entitled to any commissions on forecasted sales that he had not sold); *id.* at 168:7–22 (same); *id.* at 206:4–20 (testifying that he agreed that the Versant deal did not qualify him for commissions under the terms of the 2022 Commission Plan); *id.* at 207:11–208:1 (same). Mr. Bean has not identified any facts in the record to dispute this. As such, Mr. Bean cannot identify any disputed facts that his complaints involved wages that he believed were owed to him or actions on the part of Defendants that he believed were unlawful.

*Second*, even if Mr. Bean's complaints qualified as statutorily protected activity, Defendants contend that Mr. Bean failed to sufficiently show a nexus between the protected

activity and the allegedly adverse actions.[6]  Mem. at 15–17.[7]  To establish this causal connection, at trial, the plaintiff bears the burden of proving that the protected activity was the "true reason or motive" for the termination decision.  *Kearney v. Town of Wareham*, 316 F.3d 18, 23 (1st Cir. 2002).  However, Mr. Bean acknowledged that his behavior during the December 2, 2022 meeting is the reason for his termination.  Bean Dep. at 170:23–171:2 ("Q.  Do you believe that had you done the presentation you were asked to do you would have still been fired that day?  A.  No."); *id.* at 171:8–11 ("Q.  Well, that's what -- that is what they say.  That your refusal to do it is the reason they fired you.  So is that your understanding?   A.  That is my understanding."); *id.* at 275:10–13 ("Q.  But you had just had a call a few hours earlier where Mr. Mulholland told you you were being terminated and you knew why you were being terminated; right?  A.  For not doing the presentation.").  Mr. Bean fails to identify any evidence that the basis for his termination was related to his complaints about commissions, rather than his failure to complete the required presentation.  *See Kearney*, 316 F.3d at 23 ("Rhetoric alone will not suffice to prevent summary judgment, and, here, the facts are arrayed against [plaintiff].").

> *Third*, Mr. Bean fails to identify a factual dispute that could show that Defendants' justification for Mr. Bean's termination is pretextual.   As discussed above, Defendants have

---

[6] To the extent that Mr. Bean argues that temporal proximity alone establishes the required casual connection—though this argument is not clearly briefed in his opposition—"consistent objections voiced throughout the year," Opp. at 5, are not sufficiently close to the termination.  *See Bangua v. Shulkin*, 334 F. Supp. 3d 443, 466 (D. Mass. 2018) ("The Supreme Court has stated that '[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close[.]"'" (alterations in original) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001))); *see also Calero-Cerezo v. U.S. DOJ*, 355 F.3d 6, 25 (1st Cir. 2004) ("Three and four month periods have been held insufficient to establish a causal connection based on temporal proximity.").  As Mr. Bean himself argues, his complaints began nearly a year before his ultimate termination.   Opp. at 5; Defs.' SOF ¶ 27.  Thus, the time period is too long to imply causation.

[7] Mr. Bean does not address this second argument in his opposition.  *See* Opp. at 4–5 ("The first element regarding protected activity is the factual dispute this matter hinges.").  While this failure to address the argument waives any opposition to it, *Montany*, 858 F.3d at 41, the Court will analyze this for the sake of completeness.

identified undisputed evidence that they fired Mr. Bean due to his refusal to complete the December 2, 2022 presentation.  *See* Defs.' SOF ¶¶ 88, 90–92; Bean Dep. at 170:23–171:2, 171:8–11, 275:10–13.  Mr. Bean does not identify *any* evidence that this basis for termination is pretextual.  Mr. Bean even testified that Mr. Mulholland offered to discuss his complaints at a later time, Bean Dep. at 156:12–17, 170:8–9, but stated that Mr. Bean needed to complete the planned presentation, or he would face termination, *id.* at 236:10–13.  Nor is there any dispute that Mr. Bean faced no discipline after nearly a year of raising complaints about his quota and commissions.  *Id.* at 173:17–22 ("Q.  You had been expressing frustration and concerns about your compensation since January '22; correct?  A.  Yeah.  Q.  And you weren't terminated until December 2nd, 2022; right?  A.  Correct."); *see also* Defs.' SOF ¶ 47 (discussing Mr. Bean's raise in base salary after complaints related to quota changes).

Based on the foregoing, the Court finds that Mr. Bean has failed to raise a genuine issue of material fact as to whether his termination constitutes retaliation under Mass. Gen. Laws ch. 149, § 148A.  Thus, Defendants are entitled to summary judgment on Count III.

### B.    Covenant of Good Faith and Fair Dealing

#### 1.    Choice of Law

As discussed above, there is no dispute that the 2022 Commission Plan contains a choice-of-law provision that identifies New Jersey as the governing law.  *See supra* Section IV(A)(1).  Accordingly, the Court will apply New Jersey law with respect to Plaintiff's breach of covenant claims.[8]

---

[8] Mr. Bean does not explicitly argue that Massachusetts law should govern, though he only cites Massachusetts case law in his opposition.  *See* Opp. at 5–6.  However, given the 2022 Commission Plan's choice-of-law provision, the Court agrees with Defendants that New Jersey law applies.  *See* Mem. at 17 n.5. Regardless, the covenant of good faith and fair dealing appears to be applied similarly under both New Jersey and Massachusetts law.

2.    **Application**

"Every party to a contract . . . is bound by a duty of good faith and fair dealing in both the performance and enforcement of the contract." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 224 (2005). "Under such a covenant, neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Hunter v. Sterling Bank, Inc.*, 2011 WL 5921388, at *6 (D.N.J. Nov. 28, 2011) (quoting *Bak–A–Lum Corp. v. Alcoa Bldg. Prod.*, 69 N.J. 123, 129 (1976) (internal quotation marks omitted). The implied covenant, however, may not override the express terms of the agreement. *Wilson v. Amerada Hess Corp.,* 168 N.J. 236, 244 (2001) (citations omitted); *see also Torske v. DVA Health & Nutrition GmbH*, 2013 WL 1848120, at *5 (D.N.J. Apr. 30, 2013) ("The implied covenant of good faith and fair dealing cannot override an express contract term.").

Mr. Bean argues that Defendants acted in bad faith by altering quotas and sales opportunities, and by changing the designation of the Versant deal to ensure that Mr. Bean did not receive commissions despite his work to finalize the deal. Opp. at 6. But there is no evidence in the record that Defendants took *any* actions to deprive Mr. Bean of benefits to which he was entitled. The alterations of quotas and sales opportunities were done uniformly at the beginning of the year, Defs.' SOF ¶¶ 21, 26, 35, under the express discretion granted by the 2022 Commission Plan, *id.* ¶¶ 22–24, and there is no evidence that the changes were done to avoid paying commissions for work already completed. In fact, Mr. Bean agreed to the 2022 Commission Plan after being notified of the increase to his quota and the removal of certain forecasted sales from his pipeline. *Id.* ¶¶ 13–14, 22, 25; Dkt. 34-4. Nor is there any evidence that Defendants acted in bad faith by categorizing the Versant deal as a "Renewal" rather than as "New Business." As discussed above, this designation comports with the express terms of the 2022 Commission Plan. *See supra* Section IV(A)(2). Thus, Mr. Bean never was entitled to commissions on the Versant

deal to begin with, and Defendants' correcting the designation cannot be said to have been in bad faith. *See Torske*, 2013 WL 1848120, at *5 (finding no breach of covenant where conduct was permitted by express terms of agreement); *see also id.* at n.4 (noting that where agreement contained an integration clause, "Plaintiff may not circumvent the clear intentions of the Parties as memorialized in the written Agreement").

Further, Mr. Bean does not dispute that Defendants were entitled to assign Mr. Bean work on deals that were not commission eligible. Defs.' SOF ¶ 5. Mr. Bean received compensation for his work on the Versant deal in the form of his base salary. *Id.* ¶¶ 4, 38. He was not entitled to anything more under the express terms of the 2022 Commission Plan.

Because the undisputed facts demonstrate that Mr. Bean received all compensation to which he was entitled and there are no facts that show that Defendants' actions "destroy[ed] or injur[ed] the right of [Mr. Bean] to receive the fruits of the contract," *see Hunter*, 2011 WL 5921388, at *6, there is no violation of the implied covenant of good faith and fair dealing. As such, Defendants are entitled to summary judgment on Count IV.

## V.    Conclusion

For the foregoing reasons, Defendants' motion to strike (Dkt. 41) is GRANTED in part and Defendants' motion for summary judgment (Dkt. 31) is GRANTED.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy

Dated:  April 30, 2025                    Judge, United States District Court